# Exhibit 3



LEXSEE 2002 U.S. DIST. LEXIS 28323

**PATTERSON ENVIRONMENTAL RESPONSE TRUST, by and through its Trustees, UNION PACIFIC RAILROAD COMPANY, CONTINENTAL MARITIME INDUSTRIES, INC., ALAMEDA-CONTRA COSTA TRANSIT DISTRICT, PACIFIC TELESIS GROUP, OWENS-ILLINOIS, INC., and UNION OIL COMPANY OF CALIFORNIA, Plaintiff, v. AUTOCARE 2000, INC., et al., Defendants.**

**CIV-F 01-6606 OWW LJO**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA**

*2002 U.S. Dist. LEXIS 28323*

**June 28, 2002, Decided
July 8, 2002, Filed**

**COUNSEL:** [*1] For Patterson Evironmental Response Trust, Union Pacific Railroad Company, Continental Maritime Industries Inc., Alameda-Contra Costa Transit District, -- Pacific Telesis Group, Owens-Illinos Inc, Union Oil Company of California, Plaintiffs: Robert P. Soran, LEAD ATTORNEY, Downey Brand, LLP, Sacramento, CA.

For Chico Drain oil Service LLC, Defendant: Ernesto J Perez, LEAD ATTORNEY, Law Offices of Ernesto J Perez, West Sacramento, CA; Ronald C Chauvel, LEAD ATTORNEY, Greene Chauvel Descalso and Minoletti, San Mateo, CA.

For Ramos Oil Recyclers Inc dba Ramos Environmental Services, a California corporation, Kyle D Ramos, John Villanueva, Defendants: Christopher Harris, LEAD ATTORNEY, Law Office of Christopher Harris, Bozeman, MT; Ernesto J Perez, LEAD ATTORNEY, Law Offices of Ernesto J Perez, West Sacramento, CA.

For Royal Care Car, a California corporation, Defendant: Pa Lai V Lee - NOT CM/ECF REGISTERED, LEAD ATTORNEY, Baker Manock and Jensen, Fresno, CA.

For Patterson Environmental Response Trust, Union Pacific Railroad Company, Continental Maritime Industries Inc., Alameda-Contra Costa Transit District, -- Pacific Telesis Group, Owens-Illinos Inc, Union Oil Company of California, Counter [*2] Defendants: Robert P. Soran, LEAD ATTORNEY, Downey Brand, LLP, Sacramento, CA.

For Big G Inc, also known as Patchetts Ford, Defendant: Jeremy Coburn Cook, Jr, LEAD ATTORNEY, Law Office of Jeremy Coburn Cook, Turlock, CA.

For Hugh Larocque, Doing business as Chico Drain oil Service LLC, Defendant: Marc I. Hershman, LEAD ATTORNEY, Greene, Chauvel, Descalso & Minoletti, San Mateo, CA; Ronald C Chauvel, LEAD ATTORNEY, Greene Chauvel Descalso and Minoletti, San Mateo, CA.

**JUDGES:** Oliver W. Wanger, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Oliver W. Wanger

**OPINION**

Case 5:07-cv-01471-TJH-E   Document 773-3   Filed 02/02/10   Page 3 of 10

Page 2
2002 U.S. Dist. LEXIS 28323, *2

MEMORANDUM DECISION AND ORDER RE: PLAINTIFF'S MOTION FOR ORDER APPROVING SETTLEMENT AND BARRING CLAIMS (Doc.98)

I. INTRODUCTION

The Patterson Environmental Response Trust ("Plaintiff" or the "Trust") moves for an order approving settlements with 15 of the 24 named defendants in this action for contribution, declaratory relief, and equitable indemnity regarding certain environmental cleanup response costs incurred by Plaintiff. *See* Doc.98. No objections were filed. Upon oral stipulation by all parties at the scheduling conference held June 13, 2002, the motion was submitted without oral argument.

II. BACKGROUND

Plaintiff sues 24 named defendants [1] for contribution [*3] under section 113(f)(1) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), *42 U.S.C. §§9613(f)(1)*, the Carpenter-Presley-Tanner Hazardous Substance Account Act ("HSAA"), *California Health and Safety Code §25363*, and California state common law, declaratory relief under state and federal law, and equitable indemnity to recover response costs incurred responding to releases and threatened releases of hazardous substances at the Patterson PRC Superfund Site at 13331 North Highway 33 in Patterson, Stanislaus County, California (the "Site"). *See* Doc.107, First Amended Complaint ("FAC"), filed June 4, 2002; *see also* Doc.1, Complaint, filed December 27, 2001. Plaintiff alleges defendants arranged for the transport or disposal of, or transported, hazardous waste to the Site between the early 1980s and 1996. *See* FAC.

1   The named defendants are: 1) Jerry E. Beezley, dba Speedee Oil Change & Tune Up (Danville); 2) Kathleen A. Beezley, dba Speedee Oil Change & Tune Up (Danville); 3) Big G. Inc., dba Patchetts Ford; 4) Budget Tune & Lube, Inc.; 5) Chico Drain Oil Service, LLC; 6) Diablo Trading Company dba Speedee Oil Change & Tune Up (El Sobrante and Gilroy); [*4] 7) Tim Fortier dba Speedee Oil Change & Tune Up (Milpitas); 8) FJM Truck Repair, Inc.; 9) Fresno Truck Center dba Delta Truck Center; 10) Harkrader Trucking, Inc., dba HTI Tank Wash; 11) Lawrence Tractor Company, Inc.; 12) Robert McCommon dba Oil Connection; 13) Stephanie McCommon dba Oil

Connection; 14) Oil Changer, Inc.; 15) Patchetts Motors, Incorporated dba Patchetts Ford; 16) Ramos Oil Recyclers, Inc., dba Ramos Environmental Services; 17) Razzari-Dodge, Inc.; 18) Royal Car Care Incorporated; 19) Salinas Service, Inc., dba Oil Can Henry's; 20) T&T Trucking, Inc.; 21) Khalid Tawakol dba Quik Lube & Oil; 22) Ratif Tawakol dba Quik Lube & Oil; 23) Tom Lopes Distributing, Inc., dba Western States Oil; 24) Huong Truong dba Instalube. *See* Doc.107.

AutoCare 2000, Inc. (successor in interest to Speedee Oil Change & Tune Up (Danville)), Bank of Oakland (successor in interest to Speedee Oil Change & Tune Up (Castro Valley)), and Abdul Lateef dba Speedee Oil Change & Tune Up (Castro Valley), named parties in the original Complaint, have been dismissed and are not named in the FAC. *See* Docs. 1, 90, 91, 95, 107.

The Site consists of approximately 20 acres surrounded primarily by agricultural [*5] land containing irrigations canals, some of which drain into a creek which ultimately flows into the San Joaquin River. *See* Complaint at P49. The Site was operated from the early 1980s until 1997 as a recycling facility for waste oil and oily water. *See* Doc.99 at p.3. In October 1997, The United States Environmental Protection Agency (the "EPA"), in conjunction with the California Department of Toxic Substances and Control ("DTSC"), inspected the Site and observed that the operator of the Site had abandoned the facility, conditions on the Site had begun to deteriorate, the Site lacked security and had been vandalized, and many of the storage tanks were leaking and either had failed or posed a substantial risk of failure. *See* Doc.101, Exh.C at p.4.

The EPA initiated an emergency response including round-the-clock Site security, upgraded perimeter fencing, and removal of liquid in several storage tanks that were filled to dangerously high levels. *See* Doc.99 at p.3. DTSC and the EPA assessed the Site and confirmed the presence of hazardous substances including cadmium, chromium, copper, lead, mercury, and nickel. *See id.* The release or threatened release of these hazardous substances was [*6] exacerbated by the aging and dilapidated condition of the tanks, lack of integrity on the roofs of the tanks, seasonal rains, lack of regular inspection and maintenance, and the abandoned condition

of the Site. *See id.*

On August 12, 1998, the EPA issued a Unilateral Administrative Order ("UAO 98-12"), requiring 53 potentially responsible parties ("PRPs") to conduct removal action with respect to the waste oil, sludge, and oily wastewater at the Site. *See* Doc.101, Exh. A. In response to UAO 98-12, 19 of the 53 PRPs formed the Patterson Environmental Response Group (the "Group") to cooperate in complying with the terms of UAO 98-12. *See* Doc.100 at P3. The members of the Group established the Trust in October 1998 to provide a mechanism for funding and completing the removal action at the Site as ordered by the EPA. *See* Complaint at P15. The Trust is authorized to pursue contribution claims and seek reimbursement under CERCLA for work performed. *See* Doc.100 at P3. The Trust represents it has, at all times, been in compliance with UAO 98-12, and the amendment to UAO 98-12, issued November 12, 1999, *see* Doc.101, Exh.B. ("UAO 98-12A"), which included additional PRPs after the EPA elected [*7] to expand the volumetric threshold for liability to any entity that generated or transported in excess of 20,000 gallons of waste to the Site between 1980 and 1997. *See* Doc.100 at P4; UAO 98-12A at p.12; *see also* UAO 98-12 at p.8 (setting original threshold at 90,000 gallons).

In November 1999, the Trust provided those PRPs identified in the UAO 98-12 and UAO 98-12A who were not members of the Trust with the option of either joining the Trust or settling their respective liability with the Trust. *See* Doc.100 at P5. The EPA agreed that parties who joined the Trust or settled with the Trust would satisfy their individual obligations to comply with UAO 98-12 and UAO 98-12A. *See id.* The EPA reviewed the proposed settlement offers and found them consistent with the terms endorsed by the EPA in applicable guidance documents. *See id.*

In response to the offer, three additional entities joined the Trust, and 92 parties agreed to settle their liability with the Trust and assign their respective contribution rights to the Trust. *See* Doc.100 at P6. Plaintiff represents the 92 settling parties paid their allocated fair share in settlement with the Trust, resolving their responsibility to the EPA [*8] under UAO 98-12 and UAO 98-12A. *See id.*

In February 2000, the EPA notified approximately 107 additional PRPs of their liability for removal and containment of hazardous substances at the Site. *See*

Doc.100 at P7. These additional parties were given the option of joining or settling their liability with the Trust. *See id.* Approximately 90 of the additional parties settled their liability with and assigned their contribution rights to the Trust. *See id.* An additional 20 PRPs, all federal agencies, settled their liability with the Trust but did not assign their contribution rights for the Trust to pursue. *See id.;* FAC at P61.

To date, Plaintiff has incurred response costs in excess of $ 9.5 million, including costs to monitor, assess, and evaluate the release and threat of release of hazardous substances, costs of removal and disposal of hazardous substances, and other costs incurred in response to the hazardous substances release or threat of release, including storage, confinement, cleanup of hazardous substances, and attorney's fees. *See* Complaint at P73; Doc.100 at P8. The work required by the EPA under UAO 98-12 and UAO 98-12A did not include soil or groundwater remediation. *See id.* at P9. [*9] The settlement agreements at issue in the instant motion, *see* Doc.100, Exhs. A-M (the "Settlements"), do not address or otherwise resolve potential soil and groundwater contingencies. *See* Doc.100 at P30.

In October 2001, the EPA, in conjunction with the United States Department of Justice, issued an Administrative Order on Consent (the "AOC") for the removal action after engaging in extensive negotiations with the Trust. *See* Doc.100 at P9; Doc.101, Exh. C. The AOC provides that responding parties to the AOC shall have contribution protection from third parties and be released from liability for the EPA's oversight costs at the Site. *See* AOC at p.21. The Trust completed all work at the Site under UAO 98-12, UAO 98-12A, and the AOC. *See* Doc.101, Exh. D.

From November 1, 1982, through December 11, 1996, the total volume of waste deposited at the Site was in excess of 130 million gallons. *See* Doc.101, Exh. C, AOC at p.7. The total cumulative known waste deposited at the Site by the 259 named non-federal respondents in the AOC is 22,355,365 gallons, or approximately 17 percent of the total volume. *See* AOC at Attachment A. The total cumulative known waste deposited at the Site by, or attributed [*10] to, the responding federal agencies is 5,112,119 gallons, or approximately 4 percent of the total volume. *See* AOC at Attachment B. Documentation of most wastes at the Site does not sufficiently detail the characteristics and particular

qualities of the wastes. *See* AOC at p.7. Because the wastes at the Site were commingled, there is no evidence suggesting that the wastes contributed by each responding party to the Site are more toxic or of significantly greater hazardous effect than other waste at the Site. *See* AOC at p.7.

Defendants in this action are not parties to the AOC; [2] the members of the Trust and the parties who previously resolved their liability with the Trust are

parties to the AOC. *See* Doc.100 at P9. Plaintiff [3] filed this action on December 27, 2001, seeking to recover response costs it incurred in removing hazardous substances from the Site. *See* Complaint. Plaintiff has entered into written settlement agreements with 15 of the defendants (the "Settling Defendants"). *See* Doc.100, Exhs. A-M. The following chart summarizes the settlements:

| Settling Defendant | Waste Volume (gallons) | Settlement Amount |
|---|---|---|
| 1) Jerry E. Beezley, dba Speedee Oil Change & Tune Up (Danville), and | 31,300 | $ 21,221.72 |
| 2) Kathleen A. Beezley, dba Speedee Oil Change & Tune Up (Danville) | | |
| 3) Big G. Inc., dba Patchetts Ford | 10,340 | $ 7,147.00 |
| 4) Budget Tune & Lube, Inc. | 20,952 | $ 14,440.00 |
| 5) Tim Fortier dba Speedee Oil Change & Tune Up (Milpitas) | 26,175 | $ 17,670.00 |
| 6) FJM Truck Repair, Inc. | 21,263 | $ 14,630.00 |
| 7) Harkrader Trucking, Inc., dba HTI Tank Wash | 55,250 | $ 37,430.00 |
| 8) Lawrence Tractor Company, Inc. | 25,560 | $ 17,670.00 |
| 9) Robert McCommon dba Oil Connection, and | 44,125 | $ 30,400.00 |
| 10) Stephanie McCommon dba Oil Connection | | |
| 11) Oil Changer, Inc. | 28,684 | $ 19,226.28 |
| 12) Patchetts Motors, Incorporated dba Patchetts Ford | 25,395 | $ 17,553.00 |
| 13) Razzari-Dodge, Inc. | 55,250 | $ 38,000.00 |
| 14) T&T Trucking, Inc. | 62,250 | $ 37,620.00 |

| 15) Huong Truong dba Instalube | 31,555 | $ 21,850.00 |
| TOTAL | 438,099 | $ 294,858 |

*See* [*11] Doc.100, Exhs. A-M.

2   Oil Changer, Inc., is a named Respondent to the AOC. *See* AOC, Attachment A. It is unclear why Oil Changer, Inc., is a Settling Defendant in this action.

3   For the purposes of this action, the Trust consists of the following 19 members: 1) 10 Minute Lube 'N Oil; 2) Alameda Contra Costa Transit Industry; 3) ChevronTexaco Corporation; 4) Continental Maritime Industries, Inc.; 5) Holt of California; 6) Homestake Mining Company of California; 7) Lassen Gold Mining, Inc./Kinross Gold USA, Inc.; 8) National Steel and Shipbuilding Company; 9) Owens-Illinois, Inc.; 10) Pacific Telesis Group (formerly Pacific Bell); 11) Petro Stopping Centers, L.P.; 12) Pinole Point Steel Company, Inc.; 13) Santa Clara Valley Transportation Authority; 14) The Burlington Northern Santa Fe Railway Company; 15) Time Oil Company; 16) Union Oil Company of California; 17) Union Pacific Railroad of California; 18) United Can Company; 19) Waukecha Electric Systems, a division of General Signal Power Systems, Inc. *See* Doc.100, Exhs. A-M at Exh. A.

For the purposes of the UAO 98-12, UAO 98-12A, and the AOC, the Trust includes three additional members: 20) BP Exploration & Oil, Inc.; 21) General Dynamics [*12] OTS (California), Inc. (Formerly Primex Tactical Systems, Inc.); and 22) Matson Navigation Company, Inc. *See* FAC at P15.

The aggregate settlement amount from the Settling Defendants is $ 294,858.00, which represents contribution for a total of 438,099 gallons of manifested waste. *See id.* Each settlement is conditioned upon obtaining a judicial good faith determination and an order barring contribution claims. *See id.*

Pursuant to the settlements, Settling Defendants agree to 1) pay their respective settlement amounts; 2) release and covenant to hold harmless and not to sue the

Trust and each of its 19 participating members regarding any claim (that the Settling Defendant may have against the Trust or any of its members) for costs incurred in connection with the Site arising from the volume of waste attributed to a settling party, as determined by the "Waste-In Database" for the Site, prepared by Advanced Analytical Solutions, Inc.; and 3) fully cooperate with the Trust to obtain from the court a good faith determination and order barring contribution actions against the Settling Defendants. *See, e.g.,* Doc.100, Exh. A at pp. 4-5. The Trust and its members agree to: 1) perform all required [*13] work at the Site pursuant to UAO 98-12, UAO 98-12A, and the AOC; 2) file appropriate motions to obtain a judicial good faith determination of settlement and an order barring any contribution of other such actions against the Settling Defendants by any third parties; and 3) dismiss Settling Defendants from this action after obtaining the good faith determination of settlement and contribution bar order. *See e.g.,* Doc.100, Exh. A at p. 5.

## III. LEGAL STANDARD

A. Settlements of Contribution Claims between Private Parties under Section 113(f) of CERCLA

In resolving contribution claims under section 113(f) of CERCLA, a federal district court may "allocate response costs among liable parties using such equitable factors as the Court determines are appropriate." *42 U.S.C. §9613(f)(1).* Where the government seeks cost recovery, liability of non-settlors is reduced *pro tanto,* or dollar for dollar, by the amount of the settlement. *See 42 U.S.C. §9613(f)(2).* CERCLA provides no such guidance as to claims for contribution between private parties and the fairness of partial settlements in such actions.

The evaluation of a settlement in a contribution action among private parties is similar to the evaluation [*14] of a CERCLA consent decree between the government and a private litigant. *See United States v. Western Processing Co., 756 F. Supp. 1424, 1426 (W.D. Wash. 1990).* The settlement must be evaluated in terms of, *inter alia,* the strength of the case, amount of settlement, proportional share of liability, in accordance with the facts and circumstances known at the time of

settlement. *See id.* While CERCLA is silent on apportionment methodology for contribution actions among private parties, any method must take into account disparate parties whose relative fault depends upon factual circumstances, such as the volume, toxicity, migratory potential of the hazardous material at issue. *Western, 756 F. Supp. at 1431*. Allocating cleanup costs is a case-by-case determination in which a court may consider multiple factors or only one determining factor in exercising its discretion. *See Waste Management of Alameda County, Inc. v. East Bay Regional Park Dist., 135 F. Supp. 2d 1071, 1090 (N.D. Cal. 2001)* (citing *Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1187 (9th Cir. 2000))*. "The Court will not tolerate either a 'windfall' or a 'wipeout' which results in an apportionment of responsibility which arbitrarily [*15] or unreasonably ignores the comparative fault of the parties, where there is a reasonable basis for allowing that comparison to be made." *United States v. Conservation Chem. Co., 628 F. Supp. 391, 402 (W.D. Mo.1985)* (adopting the "Uniform Comparative Fault Act because the principles of that model act are the most consistent with, and do the most to implement, the Congressional intent behind CERCLA").

Contribution is an equitable remedy, and the legislative history of CERCLA imposes on the judiciary an obligation to apportion responsibility fairly and equitably. *See Western, 756 F. Supp. at 1432*. Most courts have adopted the Uniform Comparative Fault Act (the "UCFA") in evaluating the effect of settlement upon nonsettlors because its principles are most consistent with Congress's intent in enacting CERCLA. *See, e.g., Western, 756 F. Supp. at 1432* ("Contribution and allocation is specifically what this third-party action is about, and the Court is free to apply the UCFA provisions."); *New York v. Solvent Chem. Co., 984 F. Supp. 160, 165-66, 168 (W.D.N.Y. 1997)* ("The majority of courts undertaking to allocate liability under this section have applied *section 6 of the UCFA*."); *Comerica Bank-Detroit v. Allen Indus., Inc., 769 F.Supp. 1408, 1414 (E.D. Mich. 1991)*. [*16] *Section 6 of the UCFA* provides:

> A release, covenant not to sue, or similar agreement entered into by a claimant and a person liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides.

However, the claim of the releasing person against other persons is reduced by the amount of the released person's equitable share of the obligation ....

UCFA at *§6*.

Under the UCFA, the claimant bears the risk that the ultimate liability of the settling defendant may exceed the settlement amount. *See Comerica Bank, 769 F. Supp. at 1414*. At trial, a claimant cannot recover for his own equitable share of liability or for the equitable share of liability of defendants with whom he has earlier settled. *See Comerica Bank, 769 F. Supp. at 1414-15*. The UCFA's proportionate credit rule 1) provides for equitable apportionment of responsibility; 2) furthers settlement because no precise dollar amount need be determined upon settlement; 3) eliminates the need for a good faith hearing; and 4) prevents culpable settlors from escaping liability (whereas under a pro tanto rule, a settlor who paid more than his fair share [*17] would reduce the liability of nonsettlors, a result which discourages settlement). *See id.*

B. Cal. Civ. Proc. §§877 and 877.6

*California Code of Civil Procedure section 877* provides:

> Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect:
>
> (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the

greater.

> (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties...."

*Cal. Civ. Proc.§877.*

Under California law, parties to a settlement in an action with multiple tortfeasors may request the court determine whether the settlement was entered into in good faith. *See Cal. Civ. Proc. §877.6(a).* A hearing is not required if nonsettling [*18] parties are afforded an opportunity to respond to the request for good faith determination. *See Cal. Civ. Proc. §877.6(a)(2).* A determination by the court that the settlement was made in good faith bars other joint tortfeasors from any further claims against the settling tortfeasor for contribution. *See Cal. Civ. Proc. §877.6(c).*

Relevant factors in determining the good faith nature of a settlement include whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries, a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial, and evidence of collusion or fraud. *See Tech-Bilt, Inc. v. Woodward-Clyde & Associates, 38 Cal.3d 488, 499, 213 Cal. Rptr. 256, 698 P.2d 159 (1985).* Parties opposing judicial approval of a settlement as having been entered into in good faith must demonstrate "that the settlement is so far out of the ballpark in relation to these factors as to be inconsistent with the equitable objectives of the statute." *Id. at pp.499-500* (alterations omitted).

IV. ANALYSIS

No objections were filed to this motion for an order approving the Settlements and [*19] barring claims for contribution against the Settling Defendants. Fair notice of this motion was given to all parties.

A. The UCFA is Consistent with CERCLA's Equitable Allocation Principles

In determining whether the UCFA or the pro tanto principles manifested in the Uniform Contribution Among Tortfeasors Act ("UCATA") should apply in assessing the fairness of settlements in private party CERCLA contribution claims, the distinction between the provisions of sections 113(f)(1) and 113(f)(2) is significant. Section 113(f)(1), which applies to allocation of response costs among private parties, requires the court to consider equitable factors. Section 113(f)(2) contains no such requirement. *See 42 U.S.C. §9613(f).*

> When the government reaches a settlement in a CERCLA action, it does not bear the risk that it settled for too little with one party, because under the UCATA, it may still pursue the non-settling parties for the remainder. This result is consistent with the joint and several liability standards under *CERCLA section 107.* The issue presently before the court, however, has nothing to do with the settlement risk that the government bears. The government bears no risk in the present [*20] case because it has settled its entire claim. The issue here is who bears the risk that [the Trust], a private party seeking contribution from other private parties, settled for too little with its co-defendants in entering into one of the multiple [settlements] currently pending approval. [The Trust] should bear that risk, and *section 6 of the UCFA* should apply.

*Solvent Chem. Co., 984 F. Supp. at 165.*

One disadvantage of the UCFA is the uncertainty a settling party must accept regarding the amount it will ultimately be required to pay. *See Comerica Bank, 769 F. Supp. at 1413.* Since the work required by the EPA and DTSC has been completed and a known amount on cleanup expended, this disadvantage is not present. The Settlements include specific dollar amounts. Applying the UCFA to the Settlements provides the advantages of the UCFA in the context of the certainty usually provided under the UCATA. "It is appropriate that the principles of [the] UCFA govern the effect of settlement of both federal and state law claims in this case." *Acme Fill Corp. v. Althin C.D. Med., Inc., 1995 U.S. Dist. LEXIS 22308, 1995 WL 822664, *3 (N.D. Cal. 1995)* (applying the UCFA to settlements of federal and state law contribution claims [*21] in environmental cleanup case, and noting

that the Ninth Circuit applied the UCFA scheme in a security case, *Franklin v. Kaypro Corp.*, 884 F.2d 1222 *(9th Cir. 1989)*, but "has not ruled that UCFA, UCATA, or some other standard should govern in CERCLA settlements"). The legal effect of these Settlements is governed by *section 6 of the UCFA*.

B. The Settlements are Fair, Reasonable, and Further the Goals of CERCLA

The UCFA's comparative fault principle, adopted for the purposes of the Settlements, "does not require a hearing on the fairness of the settlement to other tortfeasors." *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 1987 U.S. Dist. LEXIS 11961, 1987 WL 27368, *2 (N.D. Ill. 1987)* (concluding "that the comparative fault rule applies to a settlement among non-governmental parties in a CERCLA action without a prior hearing on the settlement's fairness to the non-settling defendants") (citing *Conservation Chem., 628 F.Supp. at 399*). The Trust has removed the hazardous liquid from the Site as directed by the government (not including soil and groundwater remediation which was not required). *See* Doc.101, Exh. D. The public's interest in prompt environmental cleanup, adequate compensation, and compliance with government [*22] cleanup directives has been accomplished. The public's interest in how the Trust's already-incurred cleanup costs are apportioned among private parties is insufficient to justify an extensive hearing.

The Settlements were negotiated at arms length between the parties, an indicia of procedural fairness. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990) (Procedural fairness is judged by the "candor, openness, and bargaining balance" with which the negotiations proceeded.). Responsible parties must be accountable and provide compensation for past wrongs. *See Cannons, 899 F.2d at 87*. The Settlements are based on an assessment of each Settling Defendant's potential liability under CERCLA, the California Superfund, and other equitable claims filed by the Trust. *See* Doc.100 at P27. There is no evidence suggesting that the wastes contributed by each responding party to the Site are more toxic or of significantly greater hazardous effect than other waste at the Site. *See* AOC at p.7. The calculation of costs incurred in connection with cleanup of the Site based almost entirely on the volume of waste attributed to each Settling Defendant, as determined by Advanced Analytical [*23] Solutions, Inc., an independent entity

not a party to this action or a named respondent in the UAO 98-12, UAO 98-12A, or AOC, is reasonable under the circumstances.

The amount of waste attributable to parties named in the AOC and the Settlements is 27,876,719 gallons, [4] or 21.4% of the total 130 million gallons of waste at the Site. Of the waste attributed to an identified party, the Settling Defendants are responsible for 438,099, or 1.57% of the total 27,876,719 gallons. The Settling Defendants' aggregate payment of $ 294,858 is 3.1% of the $ 9.5 million expended in removing the hazardous waste, or almost twice as much as the Settling Defendants' proportional share based strictly on volume of waste. The Settlements are substantively fair and reasonable to the public and nonsettling parties.

> 4   This figure does not double-count the amount of waste, 28,684 gallons, attributable to Oil Changer, Inc., named in the AOC and a Settling Defendant.

Since the Settlements are between private parties and governed by the UCFA, the Trust, not the public or nonsettling parties, bears the risk that the settlement amounts are too low. The terms of the Settlements are consistent with settlements previously [*24] reached with numerous other parties prior to the commencement of this action and approved by the EPA. *See* Doc.100 at P31.

CERCLA seeks prompt responsive action, accountability from responsible parties, and a cleaner environment. *See Cannons, 899 F.2d at 91*. The Settlements are consistent with CERCLA's goal of reducing litigation and transaction costs associated with responses to environmental hazards. *See Cannons, 899 F.2d at 90*. The Settlements provide for adequate compensation in light of the Settling Defendants' alleged liability at the Site. The Trust has completed the cleanup work required by the government pursuant to UAO 98-12, UAO 98-12A, and the AOC. *See* Doc.101, Exh. D. The prompt responsiveness and effective cleanup by the members of the Trust is consistent with CERCLA's objectives and worthy of compensation by other responsible parties. The public interest in prompt and effective environmental cleanup and accountability is furthered by the Settlements.

The Settlements do not bar claims for contribution for work such as soil and groundwater remediation not

included in the UAO 98-12, UAO 98-12A, and AOC. The public's interest in compensation for any further necessary cleanup [*25] is not impaired.

The Settlements are fair, reasonable, adequately compensate the Trust and the public, and further the goals of CERCLA.

C. Good Faith under the California Code of Civil Procedure

The total cost to date of cleaning up the Site as ordered by the government in the AOC is $ 9.5 million. *See* Doc.100 at P8. All work requested has been completed. *See* Doc.101, Exh. D. The Settling Defendants' aggregate payment is 3.1% of the total expended to date in performing the removal work. This amount is not "so far out of the ballpark" in relation to the Settling Defendants' 1.57% proportional share of liability (based strictly on volume of waste) as to be inconsistent with the equitable objectives of *Cal. Civ. Proc. §§877* and *877.6. See Tech-Bilt, 38 Cal. 3d at 499-500*. The Settlements are based on an assessment of each Settling Defendant's potential liability as determined by an independent assessment of the Site and the amount of waste attributable to each identified responsible party. The Trust, not the public or nonsettling parties, bears the risk of any shortfall. There is no evidence the Settlements are the product of fraud or collusion among the parties.

The Settlements are within [*26] the reasonable range of the Settling Defendants' proportional share of liability. *See Tech-Bilt, 38 Cal. 3d at 499*. The Settlements are entered into in good faith within the meaning of *Cal. Civ. Proc. sections 877* and *877.6*.

V. CONCLUSION

The Settlements are fair, reasonable, and further the goals of CERCLA. *Section 6 of the UCFA* , consistent with the equitable principles of CERCLA, governs the legal effect of the Settlements. The Settlements are good faith settlements within the meaning of *Cal. Civ. Proc. sections 877* and *877.6*.

An amended proposed order consistent with this memorandum decision has been lodged and will be executed by the court.

SO ORDERED.

DATED: June 28, 2002.

/s/ Oliver W. Wanger

Oliver W. Wanger

UNITED STATES DISTRICT JUDGE